HEARD NOV. TERM, 1870.

## CREIGHTON vs. PRINGLE.

A deed of marriage settlement, after declaring the uses, trusts and limitations of the settlement, contained a clause empowering the trustees to sell, &c., the proceeds to be held subject to the same uses, &c., "as are hereinafter set forth," &c. *Held* that the term "hereinafter" must be read hereinbefore.

A mistake, apparent on the face of the deed, may be corrected without the aid of extrinsic evidence.

A power contained in a deed of marriage settlement, authorizing the trustees to sell or exchange, and re-invest, on the written request of *baron* and *feme*, or the survivor, and hold the proceeds, &c., "to the same uses, trusts, intents and purposes, and subject to the same declarations and limitations," as are set forth in the deed, is not exhausted by a sale of the original *corpus*, but attaches upon the proceeds, and the property purchased therewith.

Where a power authorizing the sale of trust property, or the investment of trust funds requires the observance of certain formalities, as, for instance, the *written request* of a *cestui que trust*, such formality must be strictly observed.

Bonds given in 1858 or 1859, and well secured by mortgages of real estate, and a bond given in 1853, and secured by a mortgage of slaves, were collected in Confederate currency by a trustee in April or May, 1863, and the proceeds invested in Confederate bonds: *Held* that the trustee, if he had a discretion to collect and re-invest, which was denied, had committed a breach of trust in receiving payment in a depreciated currency, and investing in Confederate bonds.

A trustee, holding bonds payable to himself, has the legal estate, and, in the absence of fraud or collusion, may discharge the obligors by accepting payment in a depreciated currency; though as between the trustee and *cestui que trust*, such acceptance amounts to a breach of trust.

Where a trustee committed a breach of trust by receiving Confederate money and investing it in Confederate bonds, the receipt of interest in Confederate money by a *cestui que trust*, who was *sui juris*, did not amount to such acquiescence as precluded her from complaining of the breach of trust.

By deed of marriage settlement the property, real and personal, of *feme*, was conveyed to trustees, to the joint use of *baron* and *feme* during their joint lives, then to the use of the survivor for life, remainder to the issue of *feme*, with limitations to the use of the trustees to preserve contingent remainders, and with power to the trustees, on the written request of *baron* and *feme*, or the survivor, to sell or exchange, and reinvest, and hold the proceeds, &c., subject to the same uses, trusts, limitations and declarations: *Held* that the legal estate remained in the trustees, notwithstanding the statute of uses, it being necessary for them to retain it in order to carry out the purposes of the settlement.

Where the trust is to preserve contingent remainders, or where the trustee has duties to perform in the execution of the trust which make it necessary for him to have the legal estate, the use will not be executed.

Trusts of personal property are not within the Statute of Uses.

BEFORE JOHNSON, CH., AT CHARLESTON, NOVEMBER, 1867.

The case is fully stated in the decree of his Honor, the Circuit Chancellor, which is as follows:

JOHNSON, Ch. In the year 1821, Ann McPherson and James Creighton were married, and a short time before their marriage they executed a deed of marriage settlement, by which they conveyed all the property of the former, which consisted of lands and negro slaves, to James McPherson, James E. McPherson and James R. Pringle, "and to their heirs and assigns," for them "and the survivors of them, and the heirs, executors, administrators, and assigns of such survivor," to hold, after the solemnization of the marriage, subject to the following trusts, to wit: For the use of Creighton and wife during their joint lives, and for the use of the survivor for life; and after his or her death, for the use of the child or children of the wife, who might be living at the death of the survivor, the child or children of any deceased child to represent the deceased parent.

After specifying the parties for whose benefit the property was to be held, the following clause occurs in the deed, to wit: "And it is

further stipulated and agreed upon by and between all the parties
to these presents, and the true intent and meaning hereof is, that in
case the said James Creighton and Ann McPherson shall, at any
time hereafter, during the coverture, or the survivor of them at any
time after discoverture shall think fit, and beneficial to their interest
or the interest of the survivor of them, the said James Creighton
and Ann McPherson, to have the aforesaid real and personal prop-
erty, or any part thereof so granted, released and transferred to
them, the said James McPherson, James E. McPherson, and James
R. Pringle, sold and disposed of, or exchanged for other property,
real or personal, and the sale moneys invested in public or private
stock, or in any bank stock or fund, or laid out at interest on pri-
vate security, or in the purchase of any other estate, real or personal,
that then the said James McPherson, James E. McPherson, and
James R. Pringle, or the survivor or survivors of them, and the
heirs, executors, and administrators of such survivor, on being
thereunto requested in writing by them, the said James Creighton
and Ann McPherson, jointly, if in their joint life time, or by the sur-
vivor of them, the said James Creighton and Ann McPherson, if
after the death of either of them, shall absolutely sell, dispose of,
convert or exchange the same or any part thereof, as the case may
be; and from and immediately on such sale, exchange or substitu-
tion or investment, have and hold the moneys arising or to arise
from such sale, exchange or substitution, and the property, real and
personal, stocks, certificates, choses in action, or other evidences of
debt, acquired by means thereof, to and for and upon the same
uses, trusts, intents and purposes, and subject to the same declara-
tions and limitations as are hereinafter set forth, limited and de-
clared of and concerning the hereinbefore granted, released and as-
signed premises, and to and for no other use, intent, or purpose what-
soever."

In the subsequent portion of the deed, there are no "uses, trusts,
intents, purposes, or declarations and limitations" set forth.

The three trustees named in the deed, after the marriage, took
possession of the property, and continued to manage it, in accord-
ance with the terms of the conveyance, until the year 1840, when
James R. Pringle, who survived the other two, died, leaving the de-
fendant, James R. Pringle, and three other children surviving
him.

In 1837, James Creighton died, leaving surviving him his widow,
Ann Creighton, and four children, to wit: Susan, who has since in-

termarried with John S. Mitchell ; Ann, who has since intermarried with J. Fraser Matthewes ; John McP. Creighton and James M. Creighton, who died in 1862, leaving one child, Martha Ann, who is still an infant, surviving him. All of whom, as remaindermen, are made parties, as complainants, in the Bill.

The trust property was managed exclusively by Mrs. Creighton, from 1840 until the early part of 1853, when, upon her application to the Court of Equity, by petition, George M. Coffin and the defendant, James R. Pringle, were, by the order of the Court, appointed and substituted as trustees, in lieu and stead of the original trustees, and, by the terms of the order, were invested with the same power and charged with the same trusts as those mentioned in the deed.

On the first day of February, 1853, Mrs. Creighton requested George M. Coffin and James R. Pringle, as trustees, in writing, to sell the land conveyed in the deed of marriage settlement to Loftus C. Clifford for the sum of $28,025, and to take his bond, conditioned for the payment of the same, in one, two, three, four, and five years from that date, bearing interest from date, and payable annually, and to secure the same by a mortgage of the land ; and also to sell all the negro slaves belonging to the trust estate, to Loftus C. Clifford, for the sum of $30,210, and to take his bond, conditioned for the payment of the same, on the same time and terms they were directed to take the other bond, and to secure the same by a mortgage of the negroes. The sales were made and the bonds were taken by the new trustees, in accordance with the terms of the written request.

For several years the interest on these bonds were collected by the trustees, as it became due, and was paid over by them to Mrs. Creighton, and in 1858 or 1859, George M. Coffin, who was the active trustee, with the knowledge and consent of James R. Pringle, received from L. C. Clifford $20,082, as a part payment of the principal due on the bond, conditioned for the payment of $30,210, and invested the same, without requiring the written request of Mrs. Creighton, in the separate bonds of different persons, each of which was well secured, at the time, by mortgage of real estate, and in 1861, he received, with the consent of his co-trustee, from L. C. Clifford, on the same bond, as a part of the principal due on the same, $1,150, and invested in Confederate States scrip of the $15,-000,000 loan, which, I think, was done on the written request of Mrs. Creighton.

On the 30th of June, 1862, George M. Coffin, after having duly executed his will, in which James R. Pringle and William C. Bee were appointed the executors, died, leaving the same in full force, and since his death, the executors named in his will, as such, qualified, and are now executing the same.

In March or April, 1863, James R. Pringle, as surviving trustee, received Confederate notes in payment of the principal of the bonds which George M. Coffin had taken for $20,082, and, about the same time, received in the same currency $2,970.30, from L. C. Clifford, as a payment of a part of the principal on the bond which he had given for $30,210, and invested the whole amount of $23,052.30 in the bonds of the Confederate States of America.

There is no evidence from which I can infer that Mrs. Creighton had requested, in writing, James R. Pringle to make the collections, or that after making them she had so requested him to invest the amount in Confederate bonds, though, from the whole evidence, I am satisfied that soon after it was done she was informed of the fact, notwithstanding there is much that is conflicting in the testimony.

The bill was filed for the removal of James R. Pringle, and the appointment of a new trustee in his place, and for a decree against him and the estate of George M. Coffin for the amount of principal which they had received from Clifford, on his bond, during the life time of Coffin, with interest, and a decree against James R. Pringle for the amount of principal which he received from Clifford on his bond, after the death of Coffin, with interest, on the ground that under the powers conferred upon them by the deed of marriage settlement, they had no right to receive payments of any portion of the principal of the Clifford bonds under any circumstances; and especially, not without the written consent or request of Mrs. Creighton; and in case of failure in sustaining the propositions settled above, the bill prays for a decree against James R. Pringle for the whole amount he collected and invested in Confederate States bonds, on the ground that he should not have received payment of bonds which were given before the commencement of the war in Confederate States Treasury notes, after they had become greatly depreciated in value, and that, after receiving them, they should have been invested in better securities than they were.

In the argument of complainants' solicitors, it was insisted that by the terms of the deed of marriage settlement, the common law heir at law of James R. Pringle, Sr., was the trustee of the pro-

perty, and that all the acts of the appointed trustee were done without any legal authority, and that they were therefore void. Had the heir at law at common law of James R. Pringle, Sr., upon his death, asserted his right to manage the trust estate, I think that his claim would have been well founded; but having failed for thirteen years to do it, the action of the Court in making the appointment of new trustees, without requiring him to be made a party for the purpose of enabling him to assert his rights, must be sustained, and especially as he is not now before the Court asserting his rights, and as the parties in the bill make no complaint that the appointment was improperly made.

After the trust property was once transferred by the trustees, upon the written request of Mrs. Creighton, could there be any further dealing with the corpus of it by them; and if so, was it necessary for them to get even the written request of her before doing it, are the important questions to be decided in the case, and are questions of difficult solution and upon which I have not been able to find any authorities.

Where bonds and other choses in action are given to trustees to hold for the benefit of specified parties, without any direction in the instruments conveying them as to the manner of collecting and reinvesting, the established rule seems to be, that the trustees have the same right to collect and reinvest the funds collected which they would have in collecting choses in action due to themselves, and reinvesting the proceeds, provided it be done judiciously. Does the deed of marriage settlement in this case specify " how the moneys arising or to arise from such sale are to be collected or reinvested " by the trustees ?

All that is stated in the deed is, that they are to hold them "to and for and upon the same uses, trusts, intents, and purposes, and subject to the same declarations and limitations, as are hereinafter set forth, limited and declared of and concerning the hereinbefore granted, released and assigned premises, and to and for no other use, intent or purpose whatsoever." Is there enough in the deed, taking it as a whole, to justify the Court in concluding that the word "hereinbefore" must be substituted for the word "hereinafter" in the above. If so, I think it necessarily follows that no change of investment of the Clifford bonds, or any portion of them, could be made by the trustees without first getting the written request of Mrs. Creighton for that purpose, and that even the payments made by Clifford, beyond the interest, could not be sustained. I am strongly disposed

to think that the former of the two words was intended for the latter ; but having no authority to sustain me in so deciding, I must take the deed as I find it, and give due force to the words as used, and, in doing that, my judgmemt is, that the trustees had the right to collect the Clifford bonds and to reinvest the proceeds without requiring the written request of Mrs. Creighton for that purpose, just in the same way as if they had been conveyed to them in the deed without any restrictions as to their collections, and the reinvestment of the proceeds. Was it judicious to make the collections that were made, at the time they were made, in Confederate States Treasury notes ? The evidence is, that the most prudent and judicious persons were in the habit, at the time the payments were received, of collecting old notes, that were well secured, in Confederate money, which, according to our decisions, is the true test, and, as I think, the correct one.

After the collections were made was it judicious to invest the money in Confederate bonds? This was sanctioned by the Act of the Legislature of 1861, by the constant practice of this Court, by the habit of our most prudent business men, and by the complainant, Ann Creighton, in selling her house and lot in the city of Charleston, in 1863, and in investing the proceeds of the sale in Confederate bonds. From the previous decisions in this State, there can be no doubt upon that subject.

The defendant, James R. Pringle, holds for the complainants the bond of L. C. Clifford, conditioned for the payment of the sum of $30,210, and the other bond, on which there is a balance of principal due, amounting to the sum of $6,082.33, and interest is due on each of the above amounts from the 10th day of January, 1864.

James R. Pringle makes no objection to the appointment of a new trustee in his place, and from what I infer to be the state of feeling between the parties, I think that another trustee should be substituted to execute the trusts of the deed.

It is ordered and decreed, that the above opinion be taken as the judgment of the Court.

It is also ordered and decreed, that it be referred to Master Gray, to ascertain and report a fit and proper person to be appointed trustee in the place of James R. Pringle, and also the terms on which he should be appointed.

It is ordered and decreed, that further orders may be taken at the foot of this decree.

And it is also ordered and decreed, that the complainants do pay

their costs, and that the defendant, James R. Pringle, do pay the costs of the defendants.

The complainants appealed, and now moved this Court to reverse the decree, upon the grounds :

1. Because, as by the deed of settlement the power to " sell, dispose of, convert or exchange" the settled property, is given to three trustees by name, or " *the survivors or survivor of them, and the heirs, executors, and administrators of such survivor,* to be exercised by them, as the agents of the tenants for life, only should they, the trustees, be thereunto" requested in writing by them or by the survivor of them, without such written request, this power had no existence, or remained dormant.

2. Because James R. Pringle, the defendant, and Mr. George Coffin never did or could execute, *under* the deed of settlement, this or any other power, either as agents or trustees, for the reason that by the express limitations of the said deed, on the death of the *survivor* of the three named trustees, his, the " *survivor's,* heirs, executors, or admininstrators," became the *trustee,* through whom alone the power could be effectually exercised ; their possession, therefore, of the property after January, 1853, was not under and by virtue of the deed, but merely as the agents of the life tenant, with *notice* of the trusts and the existence and rights of the remaindermen.

3. Because the decretal order of the Court, substituting Messrs. Coffin and Pringle, with *their consent,* in the place of the three deceased trustees, was made upon the *ex parte* application of Mrs. Creighton, to which neither of the remaindermen nor the successor of the surviving trustee (in whom alone was the legal estate), were parties, or even had notice. The Court, upon such an application, could confer no other or greater power than could Mrs. Creighton herself, *without* the aid of the Court ; in taking possession, therefore, under, this order, with full knowledge of the limitations of the deed of settlement, they made themselves, as to the remaindermen, *trustees in their own wrong,* and subjected themselves thereby to the responsibilities of rightful trustees, without acquiring any of their powers, rights, or immunities.

4. Because the Chancellor has assumed that it is not competent for any one to complain that Messrs. Coffin and Pringle were not the rightful trustees, or call in question their acts, except the " heir, executor, or administrator of the survivor of the original trustees," and as he is not before the Court complaining, and has never complained, even *the remaindermen* whose rights, though vested, had not,

and have not yet come into possession, are bound, and must submit to the consequences of their mal-administration.

5. Because if in the sale of the settled property to Mr. Clifford in 1853, the power "to sell, dispose of, convert or exchange," was legally exercised, it was also thereby exhausted; and no other or further power remained either in the trustees or Mrs. Creighton; the power to change or vary the investments at pleasure, is by the deed given to no one.

6. Because if the power was not exhausted, and Messrs. Pringle and Coffin were regularly in, under the deed, as trustees, yet the investment by them, in 1858 and 1859, of *trust* moneys, in the bonds of Dr. Heriot, Mrs. Heriot, and Mrs. Perroneau, and in 1861 in a Confederate bond, not having been made on "the written or any other request of Mrs. Creighton," were not in conformity with the conditions of the power; but, as the said investments, with the exception of the Confederate bond, were subsequently approved by Mrs. Creighton, and, with the approbation of the remaindermen, from thenceforth became a part of the trust property, "subject to the same uses, trusts, intents, and purposes as are set forth, limited, and declared of and concerning" the property originally settled, and to no other use, intent, or purpose whatever, it was incumbent on the said trustees to shew that in permitting the obligors, in April, 1863, to pay their bonds with Confederate notes, at their par value, and reinvesting in Confederate bonds, they acted on the written request of Mrs. Creighton, and in good faith.

7. Because if Mrs. Creighton, the tenant for life, is concluded by her *subsequent* approval of the various changes made in the trust estate by Messrs. Pringle and Coffin, or by Mr. Pringle, as survivor, of which there is no evidence, as the Chancellor admits, the remaindermen certainly are not, but his Honor has entirely overlooked their rights; they are the children of the marriage, and, therefore, purchasers for valuable consideration of the trust estate; the decree ought, at least, to have been in their favor.

8. Because a trustee has only such powers as are expressly conferred on him by the instrument creating him trustee, and to which he must refer his acts; none will be implied—he is the creature of the deed. The Chancellor is, therefore, wrong in assuming that if the word "*hereinafter*," in the deed, though in by mistake, cannot be read "*hereinbefore*," as it should be, if necessary, the power of the trustees was unlimited, and the written request of Mrs. Creighton

not necessary to empower them to exchange the said bonds for worthless paper, and reinvest in still more worthless bonds.

6. Because, if, as a general rule, a rightful trustee may, without the consent or knowledge of his *cestui que trust*, receive payment of bonds held by him in trust, and payable in gold, whenever the obligors may offer to pay, it certainly is not the *right* of a trustee, especially one in his own wrong, to exchange such bonds for an equal amount of unsecured, depreciated paper currency; and if there ever was in this State any law or custom, or course of business having the force of law, as the Chancellor seems to think, which gave to obligors the right to tender such paper as a legal satisfaction of their bond, and imposed on the holders the obligation to receive the same as equal to gold, the said law or custom, or course of business, was in violation of the obligation of contracts, and the Constitution of the United States; still less is it the right of a trustee, whether in rightfully or of his own wrong, to exchange such paper without the consent of his *cestui que trust*, for depreciated and depreciating bonds, unsecured and payable upon a contingency, and retain them until they became worthless.

10. Because if Messrs. Coffin and Pringle were rightfully in as trustees, they did not, in the management of the trust estate, act with good faith and that care and circumspection which a man of ordinary prudence would exhibit in the conduct of his own affairs.

11. Because the currency for which the bonds of Dr. Heriot, Mrs. Heriot, and Mrs. Perroneau, were exchanged by Mr. Pringle, was not, in any sense of the word, money, or the representative of money, and it, as well as the bonds purchased with it, were void in their inception by the first Article, tenth Section, of the Constitution of the United States. It is not, therefore, sufficient to refer to the fact that such paper was current and generally received as money, or was legalized by the Act of 1861. It is not the right of a trustee, especially one in his own wrong, to jeopardize the trust property by a doubtful investment.

*De Treville, Campbell, Rutledge & Young,* for appellants.

*McCrady & Son, Dunkin, W. A. Pringle,* contra.

Brief of appellants' counsel:

This case may be considered under the following aspects :

I. As if these trustees were in, regularly, under the deed, and invested with *all* powers belonging to the original trustees, *i. e.,* as if the case was against the original trustees.

II. As if these trustees were regularly in, under the deed, but *as trustees appointed by the Court* unable to execute the *discretionary* powers of the deed.

III. As if these trustees were mere volunteers or trustees *de son tort*, because of the irregular mode of their appointment.

IV. In reference to the question of acquiesence on the part of the life-tenant and the remaindermen.

Propositions under the first aspect:

1. That the trustees in question held the bonds into which the original property had been converted upon the same grants, and with the same powers as affected the original property, and in not complying with the provisions of the deed prescribing the mode by which the character of that property could be legally changed, are responsible for any and all losses which have occurred to it by reason of any such unauthorized change.

Subsidiary propositions and authorities:

1. The word " hereinafter" must be considered a mistake, and the mistake must be rectified by construing it " hereinbefore," or rejecting it as insensible, otherwise the deed is inconsistent, as " same" and " hereinafter" cannot both be · retained without repugnancy.—2 Cru. Dig., 241, § 6 ; 244, § 8; 245, § 12; 247, § 25 ; 248, § 31.

2. The word " hereinafter" must be rejected as insensible, or construed " hereinbefore," because if allowed its natural import it must defeat the manifest intent of the deed.—2 Cru. Dig., 242, § 2, note 1 ; *Hogeson* vs. *Bussy*, 2 Atk., 91; *Arundel* vs. *Arundel*, 1 M. & K., 316.

The word " hereinafter" being rejected as insensible, or construed " hereinbefore," the deed is consistent with itself, and the trustees hold under the same trusts and affected with the same *powers* as the original trustees.

3. The terms of the deed are that any property substituted for the original property must be held subject " to the same uses, declarations and limitations," and these terms include *powers*.—1 Sug. on Pow., 4, 118; 2 Fearne, 10, § 26; Ib., § 108 and 109; 1 Fearne, 563, note.

It is unquestioned there was no written request of Mrs. Creighton for change of investment as deed required, and such being the case,

4. The trustees, not complying with the requirements of the deed, are responsible.—Hill on Trust., 369, 3d Amer. Edit. ; *Cocker* vs. *Quayle*, 1 Russ & Mylne, 535; *Hopkins* vs. *Myall*, 2 Russ & Milne, 86.

If contended that the power was exhausted by a *single* exercise, complainants insist:

5. That power was *not* so exhausted.—1 Sug. on Pow., 515; *Palk* vs. *Lord Clinton,* 12 Ves., 48.

6. That, if exhausted, trustees being *without* special power of any kind under the deed, are responsible for changing of their own will. A good investment, secured by *real* estate, for a doubtful, uncertain contingent and unlawful investment.—Lewin, 512; Lewin, 523; *Howe* vs. *Earl of Dartmouth,* 7 Ves., 150; *Sitwell* vs. *Bernard,* 6 Ves., 544, and Notes; *Seidler* vs. *Turner,* 8 Ves., 621; *Angell* vs. *Dawson,* 3 Y. & Coll., 317; *Lud* vs. *Godfrey,* 4 Mad., 454; *Franklin* vs. *Frith,* 3 Bro. Ch., 434; Hill on Trustees, 382; *Brice* vs. *Stokes,* 11 Ves., 324; *Quick's Ex.* vs. *Firken,* 1 Stock N. P., 802; *Adam* vs. *Shaw,* 1 Sch. & Lefroy, 272; *Goodwyn* vs. *Clewly,* 2 Belw., 30; *Glover* vs. *Glover,* McM. Eq., 153; *Ackerman* vs. *Smith,* 4 Barb. Sup. Ct. R., N. Y., cited 10 Am.; Dig. No. 49, p. 421; *Freeman* vs. *Cook,* 6 Ired. Eq., 373.

From the above authorities and positions it is clear that these trustees are liable either because they did not fulfill the requirements presented in the deed, for changing investment, or because they without authority or necessity and voluntarily changed investments, and to the injury of those interested.

Propositions under the second general aspect in which this case may be considered:

Prop. II. That whether trustees appointed by a Court can execute the discretionary powers of the deed or not is *practically* unimportant in this case, because if they *cannot,* their position is that of trustees *without special authority or power* changing investments, which has been already considered. And if they can, then, under this deed, the questions would again be, was the power a continuing power? or was it exhausted by a single exercise?

As to trustees appointed by Court executing discretionary powers.—1 Sug. on Pow., 152, § 73; *Att. Gen.* vs. *Doyley,* 4 Vin. Abridg., 485, and 2 Eq. Ca. Abridg., 194; *Cole* vs. *Wash,* 16 Ves., Sr., 46 and 47; *Hebbard* vs. *Lamb,* Amb., 309; Lewin, 712 and 713; Lewin, 530 to 636; *Bartley* vs. *Bartley,* 3 Drew., 384; *Brum* vs. *Chalmers,* 4 De. Gex., M. & G., 528; *Byrne* vs. *Byrne,* 19 Brad., 66; *Vide* also the Act 1796, 5 Stat., 277.

Propositions under the third general aspect in which the case may be considered:

Prop. III. That these trustees were mere *volunteers or trustees de*

*son tort*, because of the irregularity of their appointment. The legal title of the trust estate, together with the powers connected with it, being in the heir at law, and executor or administrator (as the case might be) of the last surviving trustee, who have never been legally divested of it; and, as such, are affected with the stringent responsibility belonging to such relations.

1. As to what persons can legally execute a *power.*—1 Sug. on Pow., 141 to 148; 1 Sug. on Pow., § 66, 147; Hill Trustees, 473; *Hawkins* vs. *Kemp*, 3 East, 410; *Cooks* vs. *Crawford*, 13 Simons, 91; *Eaton* vs. *Smith*, 2 Beav., 239; *Sharp* vs. *Sharp*, 2 B. & Ald., 405; Lewin, 266; *Martin* vs. *Price*, 2 Rich. Eq., 412.

2. As to whether the legal estate of the trust passed out of the persons in whom it was vested by law upon an *ex parte* proceeding to which they were not parties.—Act of 1796, 5 Stat., 277; *Ex parte Knust*, Bail. Eq., 489, 491; *McNish* vs. *Guerard*, 4 Strob. Eq., 80; *Thomas* vs. *Higham*, Bail. Eq., 222; *Tilley* vs. *Wostenholm*, 7 Beav., 425.

Propositions under the 4th general aspect in which the case may be considered.

Prop. IV. That there is no such acquiescence on the part of the life-tenant as will bar her claim to the relief sought, and if it shall be held that the life-tenant is barred, the remaindermen unquestionably are not.

1. As to acquiescence of the life-tenant.—*Randall* vs. *Errington*, 10 Ves., 427; *Walker* vs. *Symonds*, 3 Swans., 65; *McDonnell* vs. *Harding*, 7 Sim., 178; *Brice* vs. *Stokes*, 11 Ves., 319; Lewin on Trusts, 774–778; Hill on Trust., 382; *Cockerel* vs. *Cholmeley*, 1 Russ. & Myl., 425; *Fish* vs. *Miller*, 1 Hoffman's R., 280.

2. As to remaindermen, their rights, and how barred.—*Smith* vs. *Poyas*, 2 Des., 65; *Gardner* vs. *Hardee*, 2 McC. Ch., 32; *Smith* vs. *Deas*, 2 McC. Ch., 143; *McLean* vs. *Blower*, Harp., 272; *Spear* vs. *Spear*, and *Simms* vs. *Logan*, 9 Rich. Eq., 184; Lewin on Trusts, 723 and 774; Hill on Trust., 382; *Bennett* vs. *Cole*, 5 Simons, 181, and 2 M. & K., 225.

Case affecting the general liability of trustees, and such liability as affected by questions connected with Confederate currency or securities.—*Miller* vs. *Sligh*, 10 Rich. Eq., 249; *Bryan* vs. *Mulligan*, 2 Hill. Ch., 360; *Odell* vs. *Young*, McM. Eq., 155; *Glover* vs. *Glover*, McM. Eq., 153; *McKnight* vs. *McKnight*, 10 Rich. Eq., 157; *Hext* vs. *Porcher*, 1 Strob. Eq., 171; *Boggs* vs. *Adger*, 4 Rich. Eq., 410; *Townley* vs. *Sherbourne*, White & Tudor's Lead. Cas. in Eq., vol. 2, part 2, p. 280.

Liability as affected by questions connected with Confederate currency or securities.—*Manning* vs. *Manning*, 13 Rich. Eq., 410 ; *Snelling* vs. *McCreary*, 14 Rich. Eq., 291 ; *Wiseman & Finley* vs. *Hunter*, 14 Rich. Eq., 167 ; *McPherson* vs. *Lynch*, 14 Rich. Eq., 121 ; *McLure* vs. *Steele*, 14 Rich. Eq., 105 ; *Thorington* vs. *Smith*, Sup. Ct. U. S., MS.

Brief of counsel for appellees :

*First.* That the consent of the *cestui que trust* to the marriage settlement was necessary only in the first instance, and only as to the property conveyed in the deed, and that when the consent was once given, it was exhausted, and the trustees held the trust property with such powers as generally belong to trustees, without special directions.—2 Bl. Com., 169 ; Fearne 1, § 1 ; 2 Cru. Dig., 261–3 ; 4 Kent Com., 306 ; *Smith* vs. *Packhurst*, 3 Atk., 134 ; *Garth* vs. *Cotton*, 3 Atk., 751 ; Adams' Eq., 302 ; *Tilley* vs. *Wasterholme*, 7 Beav., 424.

*Second.* That after the sale to Mr. Clifford, under the direction of Mrs. Creighton, upon a credit of five years, it was within the duty and authority of the trustees to receive the payment upon the bonds of Mr. Clifford when they became due, and to invest the proceeds.— Hill on Trust., 383, 483, 508 ; *Wood* vs. *Harman*, 5 Mad., 368 ; *Wormley* vs. *Wormley*, 8 Wheat., 421 ; Lewin on Trusts, 433 ; Hill on Trustees, 370.

*Third.* That the trustees did exercise such discretion, judgment and diligence in the management of the trust fund as the honest and prudent men of the State exercised in the management of their own affairs, and that this is the only rule laid down in this State as the measure of responsibility for a trustee.—*Hext* vs. *Porcher*, 1 Strob. Eq., 170 ; *Boggs* vs. *Adger*, 4 Rich. Eq., 408 ; *Spear* vs. *Spear*, 9 Rich. Eq., 184.

*Fourth.* That the receipt by the trustees of the Heriot and other bonds in the notes of the Confederate States, and their investment of these and other receipts in Confederate securities, were legal and legitimate.—*Boggs* vs. *Adger*, 4 Rich. Eq., 408 ; *Manniny* vs. *Manning*, 13 Rich. Eq., 410 ; *Hale* vs. *Shannon*, Appeal Court of So. Ca.; *McPherson* vs. *Gray*, 14 Rich. Eq., 121 ; *Pearce* vs. *Venning*, 14 Rich. Eq., 84 ; A. A. So. Ca., 1861 ; *Thorington* vs. *Smith & Hartley*, Am. Law Reg., vol. 8, No. 12, p. 739 ; *Phillips* vs. *Hooker*, Am. Law Reg., vol. 7, No. 1, p. 16 ; *Knight* vs. *Plymouth*, 1 Dickens, 28 ; *Thompson* vs. *Brown*, 4 John. Ch., 629 ; *Ex parte Belsher*, Amb.,

218; *Snellins* vs. *McCreery*, 14 Rich. Eq., 291; *McClure* vs. *Steel*, 14 Rich. Eq., 105; *Rainsford* vs. *Rainsford*, Rice's Eq., 69.

*Fifth.* That it is a mistake in fact that James R. Pringle, the appellee, is not the heir at law and administrator of his father, James R. Pringle, the surviving trustee, because he was both his heir at law and administrator, and there was no issue tendered on that point, there being no allegation to the contrary made in the complainant's bill.—*Pringle* vs. *Ravenel*, 3 Rich. Eq., 342.

*Sixth.* That the substitution of trustees by the decree of the Court of Equity, of 25th January, 1850, was according to the course of the Court, and bound all who may claim under the deed.—*Cursus Curiæ est lex Curiæ*, Broom's Maxims, 98; *Omnia præsumuntur solemniter esse acta*, Ib. 729; *Ex parte Tunno*, Bail. Eq., 395; *Ex parte Krust*, Ib. 489–491; *Ex parte Copeland*, Rice's Eq., 49; *Ex parte Smith*, 1 Hill Ch., 140; *Ex parte The Greenville Academy*, 7 Rich. Eq., 481; *Dean* vs. *Sanford*, 9 Rich. Eq., 425; *McNich* vs. *Guerard*, 4 Strob. Eq., 79; A. A. 1796, 5 Stat., 229.

*Seventh.* That if the *cestuis que trust* are not bound by the acts of the substituted trustees, the property in the hands of Mr. Clifford, or emancipated by legal authority, and sold to him by trustees who had no right to represent them, is liable to the trust, and that Mr. Clifford is not a party to the proceedings.—1 Story Eq., Sec. 308; 4 Kent, 308.

*Eighth.* That if the trustees had no right to receive the payment of the Clifford or Heriot bonds, in Confederate Treasury notes, their receipts and satisfaction for these amounts are void, and the mortgages given to secure these amounts may be set up for the benefit of the remaindermen, and that the mortgagors are not parties to these proceedings.—1 Story Eq., Sec. 308; 4 Kent, 308, and Cases in Note *b; Murray* vs. *Ballou*, 1 Johns. Ch., 566; *Simons* vs. *Bank*, 5 Rich. Eq., 270; Lewin on Trusts, 724 *et seq.*

Brief of Mr. McCrady's argument upon construction of Marriage Settlement:

This deed is only a conveyance to uses, and as such, creates nothing but legal estates in the *cestuis que* uses. It is in the usual form of such conveyances, namely, lease and release; a form which rests upon the statute of uses. It is described as such, 2 Bl. Com., 339. "A Fourteenth Species of Conveyance." See also Ib., 327.

The conveyance to the trustees is directly to the uses as follows: (1.) Until the marriage to the use of the grantor, Miss McPherson, now Mrs. Creighton. (2.) Immediately upon the marriage, to the

use of both Mr. and Mrs. Creighton for their joint lives. (3.) Upon the determination of that estate *to the use* of the trustees to preserve contingent remainders, and to suffer Mr. and Mrs. Creighton and *their assigns* to take rents, and so forth, to joint and equal use. (4.) Upon death of Mrs. Creighton, to the use of the survivor, Mr. Creighton and *his assigns* for and during his life, without impeachment of waste. (5.) Upon the death of Mr. Creighton, "to the sole use and behoof of Mrs. Creighton and *her assigns* for and during the term of her natural life, without impeachment of waste. (6.) Upon determination of the estate of survivor *to the use and behoof* of the trustees, to preserve the contingent remainders thereinafter limited, but in trust to permit the survivor and his or her *assigns* during life to receive and take the interest, profit, issues and emoluments of the premises. (7.) And from and immediately after the decease of such survivor, then to and for such child or children of Mrs. Creighton *as may be living* at the time of the death of such *survivor*, to be equally divided between them if more than one, and their heirs, free from all trust, limitation, restriction and agreement whatever. And if such child should die, leaving issue, such issue to take what the parent would have taken if such parent had survived such survivor.

We need go no further with the limitations of the deed, but it is proper to say, that should Mrs. Creighton survive all her issue, the reversion would be hers, as the deed makes no provision for the case, as there is no limitation over. At the date of this deed, the operation of the statute of uses was well known and recognized in this State, and deeds to operate under that statute were common.

As to the first, that the operation of the statute of uses was well known and recognized, we have the case of *Ramsay* vs. *Marsh*, 2 McC., 252, in the year 1822. This deed bears date 1821. In this case it was applied to a devise, and probably the only question in the case was as to the propriety of applying it to a devise, which had another clause supposed to bear upon its interpretation.

The words of the statute are given, 2 Bl. Com., 332, " That when any person shall be seized of lands, &c., to the use, confidence or trust of any other person or body politic, the person or corporation entitled to the use in fee simple, fee tail, for life or years, or otherwise, shall from thenceforth stand and be seized or possessed of the land, &c., of and in the like estates as they have in the use, trust or confidence; and that the estate of the person so seized to uses shall be deemed to be in him or them that have the use, in such quality,

manner, form and condition as they had before in the use." Blackstone adds: "The statute thus executes the use, as our lawyers term it; that is, it conveys the possession to the use, and transfers the use into possession, thereby making *cestuis que* use complete owner of the lands and tenements, as well at law as in equity."—4 Kent., 292. The case of *Ramsay* vs. *Marsh*, points out the modes of creating "trusts" as distinguished from "uses executed" in a brief and plain way. The language of the deed shows that it contemplated the statute of uses, and that the omission of the technical words after the words in the *habendum*, giving the fee, that is the words, "go to the use of the trustees and their heirs, but in trust, and so forth," was designed; for it expressly provides that upon the determination of either of the life estates during the lives of the life tenants, that it shall then be *to the use of the trustees* for preserving contingent remainders.

There is nothing for a trustee to do. There is no separate estate to the wife free from her husband's control. There is nothing for the grantees to do but in case of destruction of a life estate by the act of life tenants, when a trust is raised by the deed, by adding the technical words "to the use and behoof of the trustees to preserve contingent remainders."

The remainders, then, to the issue are altogether contingent, and contingent upon the uncertainty of the persons who are to take. In this present case, Matthews and his wife are complainants. Since the last argument, Mrs. Matthews has died, and her issue come in her place. No decree in this case can bind the children of Mrs. Matthews who come in (if ever) as purchasers.

And so in case of the death of any of the other complainants in the life time of Mrs. Creighton leaving issue, the issue would not be bound.

Admitting that there was a breach of trust in any sense, Mrs. Creighton, at least to the extent of her interest and estate, is bound, by her consent or acquiescence, which the Chancellor, upon full consideration of the testimony, declares she gave.—Adams Eq., 62; Hill on Trust., 526.

Oct. 16, 1871. The opinion of the Court was delivered by

WRIGHT, A. J. The facts of the case are few, and so fully recited in the decree of the Chancellor, that their repetition here is unnecessary.

In his construction of the powers conferred on the Trustees, and

the obligation imposed upon them by the marriage settlement, (of which a copy is filed as an exhibit to the bill,) he has regarded them, so far as refers to the relation in which the Trustees stood to the investment of the proceeds of the Clifford bonds, as resulting from the particular words in which they are expressed, irrespective of any control over them by the purpose and intention so plainly appearing throughout the whole instrument. He admits that if " he had authority to sustain him in deciding that in the clause authorizing the sale or exchange 'of the settled property,' the word 'hereinbefore' could be substituted for 'hereinafter,' " (which former word he was strongly disposed to think was intended,) "it would necessarily follow that no change or investment of the Clifford bonds, or any portion of them, could be made by the Trustees without first getting the written request of Mrs. Creighton for that purpose, and that even the payments made by Clifford beyond the interest could not be sustained."

To show mistake in a written instrument, it is not indispensable that it should be by positive proof, through testimony outside of the instrument itself. If the use of a word, insensible in its application to the other parts of the deed, is to control its meaning so as to destroy the obvious intent, and even vitiate the purpose which is apparent from the context with which it is associated, then the rule which requires that such a construction shall be given to a will or deed as shall be consistent with its manifest intent, to be collected from it as a whole, will be entirely defeated. It is impossible, even from the first reading of the settlement, not to perceive that the word "hereinafter," in the clause referred to, is senseless—no "uses, trusts," &c., following it—while great precision has been used in their declaration in the clause which precedes it. The word "same" generally refers "to something which is mentioned before." To retain the word "hereinafter," makes the deed inconsistent with itself, besides requiring the Trustees to hold the proceeds of the property sold, or that for which it might be exchanged, on trust and conditions which could never attach, because not expressed. The plain intent of the deed is that the same uses, conditions, limitations, &c., which are annexed to the land and negroes specifically mentioned, were to attach on the property which was to be derived from their sale or exchange.

In Story's Eq. Juris., Section 168, it is said, "and for the same reason, equity will give effect to the real intent of the parties, as gathered from the objects of the instrument, and the circumstances

of the case, although the instrument may be drawn up in a very inartificial and untechnical manner. For, however just in general the rule may be, *quoties in verbis nulla est ambiguitas ibi nulla expositio contra verba expressa fienda est*, yet that rule shall not prevail to defeat the manifest intent and object of the parties, where they are clearly discernible on the face of the instrument, and the ignorance, or blunder, or mistake, of the parties has prevented them from expressing it in the appropriate language." A Court of Equity looks "to the general intent of the deed, and will give it such a construction as supports that general intent, although a particular expression in the deed may be inconsistent with it."—*Arundel* vs. *Arundel*, 1 M. & K., 316 ; *Stapilton* vs. *Stapilton*, 1 Atk., 8.

We have no hesitation in holding that the word " hereinafter " must be read " hereinbefore."

There is nothing in the deed to show that the power to the husband and wife, or the survivor, to direct a sale or exchange of the property conveyed, was exhausted by a single exercise of it, and that the same authority which they had in that regard as to the land and negroes specifically conveyed, did not extend to the proceeds of their sale, or the securities in which such proceeds might be invested.

The property all came by the wife, and the right to sell or exchange was a privilege for her benefit, and that of her intended husband. The fund settled was not to remain permanent, but to be of a character and kind preferred by the husband and wife or the survivor. If the sale or exchange of the real and personal estate conveyed by the deed, thus made on the written request of the *cestui que trust*, subjected the substituted securities to a conversion at the sole discretion of the trustees, the preference of the *cestui que trust* might be unavailing, to resist the new change proposed by the trustees. Such a result was never contemplated by the deed. It would be a singular perversion of the privileges reserved to the *cestui que trust*.

The deed, in plain and comprehensive terms, conveyed the right to the wife, as the survivor, by providing that the trustees " shall have and hold the moneys arising, or to arise, from such sale, exchange or substitution, and the property, real and personal, stock, certificates, choses in action, or other evidences of debt acquired by means thereof, to and for, and upon, the same uses, trusts, intents and purposes, and subject to the same declarations and limitations as are hereinafter (hereinbefore) set forth, limited and declared of and

concerning the hereinbefore granted, released and assigned premises, and to and for no other use, intent or purpose whatsoever." One of the intents and purposes is that, if the husband and wife, or survivor, should think it fit and beneficial to their interest, or the interest of the survivor of them, to have the aforesaid real and personal property, or any part thereof, so granted, released and transfered to the said trustees, sold and disposed of, or exchanged for other property, and the sale moneys invested in public or private stock, &c., or other property, the said trustees, on being thereunto requested, in writing, by the said husband and wife, or the survivor, shall absolutely sell, dispose of, convert or exchange the same, and so forth.

The plaintiffs do not complain of the investment in the bonds of Mrs. Heriot and others, in 1858 or 1859, of the money received on the Clifford bond. They acquiesced in the investment as judicious and properly secured, but they aver that the acceptance of Confederate Treasury notes on the Clifford and the said Heriot and other bonds, and their investment in stock of the Confederate States, was a breach of trust by the trustees, for which they are responsible. Mr. Hill, in his work on Trustees, 369, says: "If the power authorizing an investment of the trust funds on personal security require the observance of any formality, those formalities must be duly observed. Thus where the consent in writing of the wife is made requisite previous to such an investment, the trustees will be liable for investing with only her verbal consent." We see nothing in the evidence leading to a belief that the investment in Confederate bonds was at the written request of Mrs. Creighton, and we concur with the Chancellor in his conclusion on this question of fact.

Concede, however, as contended for by the defendants, that her written request was not necessary, yet they will be equally liable. The money collected on the Clifford bonds (save as to a portion, to which we shall hereafter advert,) and loaned to Mrs. Heriot and others, was equal to gold and silver coin, and was secured by mortgages of real estate. Was it consistent with the duty required by the trust confided to them, to accept payment in a depreciated currency, and invest the same in Confederate bonds? The trustees in fact paid for the mortgages so much in gold, and acknowledge satisfaction of them, in the receipt of a depreciated currency, for the amount due upon their face. Did they make any attempt even to show that in open market, in 1863, a bond secured

by mortgage of real estate would only have brought the sum due upon it, to be paid in the then prevailing currency ? We may well infer from their failure to do so, that the value of such a bond would have commanded in such currency far more than the sum which it called for. If the trustees therefore had been invested with a discretionary power as to the investment, their course prevents them from claiming the benefit of the rule which sometimes excuses an error of judgment by a trustee, in doing or omitting to do the same act which prudent and cautious men in like matters do or abstain from doing in their own affairs.—*Mayer and Wife* vs. *Mordecai*, 1 S. C., 383.

What we have said as to the payment and investment of the Heriot and other bonds will apply to the $1,150 received in 1861, on the Clifford bond, for $30,210, by the said G. M. Coffin, with the consent of the said J. R. Pringle, and to the $2,970.30, on the same bond, by the said J. R. Pringle, in 1863. The balance due upon the bond was comparatively small, and it was secured by a mortgage of a large number of slaves. The bonds had been due for some years. The trustees having indulged, while the payment in a sound currency could have been compelled, there was neither a legal or a moral obligation on them to favor the debtor at the expense of the trust estate. The payment and investment cannot be approved.

It is objected by the defendants, " that if the trustees had no right to receive the payment of the Clifford or Heriot bonds, in Confederate Treasury notes, their receipts and satisfaction for these amounts are void, and the mortgages given to secure these amounts may be set up for the benefit of the remaindermen, and that the mortgagors are not parties to these proceedings." The bonds were sacrificed by the parties having the legal title and right to receive, and unless there was fraud or collusion between them and the obligors, they must be held paid. It is sufficient to refer to the ruling of this Court on the like proposition, in the case of *Mayer and Wife* vs. *Mordecai*.

We see no evidence of any acquiesence on the part of Mrs. Creighton. Her mere acceptance at times of the interest in the only currency then existing, cannot prevail to bind her to the unauthorized acts of the trustees. Her wants may have compelled her to accept the interest in whatever medium which could answer her necessary purposes. Confederate money could procure, though at an exorbitant rate, the means of subsistence, and these she was obliged to have.

7

A point made in the argument before us, by one of the counsel for the defendants, remains to be considered. Although it resists the right of the plaintiffs to the relief sought by the bill, on the ground that they have no equitable claim in the premises as against these defendants, yet it was not made in the answers, nor does it appear to have been referred to in the argument before the Chancellor.

It is claimed that the deed is only a conveyance to uses, and as such creates nothing but legal estates in the *cestuis que use;* that its form rests upon the statute of uses; and the Court is asked to apply the consequences which follow from this relation by holding that the whole estate vested successively in the parties, who, by the death of those who precede them in interest under the deed, are entitled to take. The doctrine contended for is founded on the statute of 27 Hy., 8, generally known as the statute of uses. It transfers the possession to the person entitled to the use, and so unites the possession with the use, that he who had the right to the use was seized of the land to the same extent, and " in quality, form and condition as he before had in the use."

The statute, however, is only applied to simple trusts, whether designated in the instrument as a use or a trust, and operates upon the first use, notwithstanding the intention of the settler.—Lewin, 246. Although its purpose was to vest the legal and equitable estate in the person for whose benefit the use was created, yet very soon after its enactment its whole purpose was defeated, by its being considered by the Court that there were modes of creating a trust by which the legal estate would still remain in the trustee, and the equitable interest be enjoyed by the *cestui que trust.* Mr. Hill, in his work on Trustees, page 63, says: " It has been laid down that there are three direct modes of creating a trust of lands, notwithstanding the statute: 1st. Where a use is limited upon a use, as in a conveyance or devise to the use of A and his heirs, to the use of B and his heirs; 2nd. Where copyhold or lease-hold estates are limited by deed or will to a person upon any use or trust; and, 3d. Where the donee to uses has certain trusts or duties to perform which require that he shall have the legal estate."

If the trust is supposed to be created under the third mode, " the point to be considered is, whether any legal interest *at all,* passes to him under the limitation."—Hill, 229. The question has been so fully considered and decided by the cases in our own Courts, that it would be but a loss of time to collect and compare the English

authorities which have led our Judges to their conclusions. Nor is it necessary to encumber this opinion with the particular words of the instrument to which our Courts in the several cases gave construction. It may, in general, be said, that if any agency in regard to the trust, or its proceeds, is imposed on the trustees—if by the terms of the instrument, an active participation in the management of the trust property is required of him—if a discretion is allowed to the trustees in relation to the trust estate—and, in general, where the object of the trust would be otherwise defeated, a trust will not be held executed.— *Posey* vs. *Cook*, 1 Hill, 413 ; *Rice* ads. *Burnett*, Speer Eq., 579 ; *Janey et. al.* vs. *Laurens*, 1 Speers, 356 ; *Wilson* vs. *Cheshire*, 1 McC. Ch., 233 ; *Ex parte Gadsden*, 3 Rich., 467 ; *Williman* vs. *Holmes*, 4 Rich. Eq., 475.

In *Rice* ads. *Burnett, Trustee*, Speers Eq., 579, the marriage settlement conveyed real and personal estate of the intended wife to a trustee, to be held for her until marriage; after that event in trust to permit the husband and wife to use and possess the said property for and during their joint lives, with the same right to the survivor during his or her life, with contingent remainders over, and with a provision that the property might be sold or exchanged with the joint consent, in writing, of trustees and *cestui que trust*, and the proceeds vested in other property subject to the same trusts.

It was held that the legal title to the real estate remained in the trustee. The provisions of the settlement in that case were not unlike those in the one before us. Here, to say nothing of there being a use to Creighton and wife during their coverture, and that the interposition of the trustees was necessary for the protection of the property against the creditors of the husband, and that, by the terms of the deed, the estate was to vest in the child or children of the wife living at the death of the survivor, " free, clear and absolutely discharged of and from all and every further and other conditions, trust," &c., (which implies the continuance of the trust until such event,) by plain and express words, on the written request of the husband and wife, or either of them as survivor, the trustees are required to sell and dispose of the real and personal estate, or any part of it, or to exchange the same for other property, and the proceeds, or the substituted property, are to be held by them upon the same terms, trusts, &c. For the performance of this duty, it is absolutely necessary that the legal estate should be in the trustees. The sale or exchange and reinvestment are to be made by them, and if the use is to be held executed, how could the trustees perform the

duties so imposed by the deed? If the trust is to be regarded as executed in the husband and wife, and the legal estate entirely out of the trustees, what estate did the purchaser take in the land and negroes conveyed by the trustees? In *Barker* vs. *Greenwood*, 4 M. and W., 429, Parke, B., said: "It is also equally clear and settled that if the testator distinctly expresses his meaning to be, that the trustees are to interfere in the execution of the trusts, and certain duties are cast upon them; if he order, for example, that they shall receive the rents, &c., there they take the legal estate, whatever words may be used; and the case of *Gregory* vs. *Henderson*, 4 Taunt., 772, shows that very slight circumstances of this nature are sufficient for this purpose." There is something more to be considered as to the execution of the trust under this settlement. There was created, in favor of the trustees, a trust to preserve contingent remainders. This necessarily vested them with a legal title, for how could such interest be secured except through the legal title of the trustees? If the trust was executed, the settlement then conferred a power which, by no possibility, could be executed. In *Biscoe* vs. *Perkins*, 1 V. and B., 485, "A devise to trustees, their heirs, &c., for the life of the devisor's son, to support contingent remainders, in trust to permit him to receive the rents for life, and after his decease to his first and other sons, intail: an equitable estate in the son: the legal estate in the trustees, with a legal remainder to the first and other sons." In *Janey et. al.* vs. *Laurens*, Judge Evans, delivering the opinion of the Court, said: "So also in trusts for the use of a married woman, or to preserve contingent remainders, the very end and design of the trust would be defeated if the statute executed it."

It is not to be forgotten that the settlement here conveyed both real and personal property. All was sold to one purchaser, Clifford, who gave separate bonds for the land and the slaves. The contest between the parties is as to the amount received on the bond for the slaves. "But trusts of chattels are not within the purview of the Act."—Lewin, 7; and language to the same effect will be found in all the elementary treatises on the subject. In *Watson* vs. *Pitts*, 2 McMul., 298, the Court said: "The statute of uses has no application to trust of personalty." In *Rice* vs. *Burnett*, the learned Chancellor, delivering the opinion of the Court, said: "Neither the statute of uses, nor the 10th section of the statute of frauds, embrace personal property." See also *Youmans* vs. *Buckners*, 3 Hill, 222; *Ramsay* vs. *Marsh*, 1 McC., 255; *Harlley* vs. *Platts*, 6 Rich., 315.

Deference to the counsel who pressed his argument on this part of the case with so much earnestness, has induced us to expend more time in the consideration of it than was due to any effect which possibly could be given to it in the cause, for suppose the use was executed, and the statute of Henry VIII applied to deeds or devises of personal property, how could it avail these defendants, who cannot and do not deny the sale of the slaves to Clifford, taking his bond for the purchase money—its collection—the investment of the proceeds in the Heriot and other bonds, and the reinvestment of the proceeds of these in Confederate securities? If they did not act in the premises under the deed, then they are mere volunteers, and having converted a trust fund, to which the plaintiffs are entitled, must be subject to all the liabilities of other constructive trustees.

The decretal order of the Court was made on the 23d May, 1871. This opinion will be filed with it.

*Moses*, C. J., and *Willard*, A. J., concurred.